AO 108 (Rev. 06/09)  Application for a Warrant to Seize Property Subject to Forfeiture

# UNITED STATES DISTRICT COURT
### for the
Eastern District of Virginia

**MAR 1 3 2017**

| | |
|---|---|
| In the Matter of the Seizure of<br>*(Briefly describe the property to be seized)*<br><br>All funds held in Capital One Bank Account Number<br>1356741109 in the name of Tamer Moumen | )<br>)<br>)<br>)<br>) |

Case No.   1:17SW-123

## APPLICATION FOR A WARRANT
## TO SEIZE PROPERTY SUBJECT TO FORFEITURE

I, a federal law enforcement officer or attorney for the government, request a seizure warrant and state under penalty of perjury that I have reason to believe that the following property in the _____Eastern_____ District of _____Virginia_____ is subject to forfeiture to the United States of America under ___18___ U.S.C. § _981(a)(1)(C)_ *(describe the property)*:

All funds held in Capital One Bank Account Number 1356741109 in the name of Tamer Moumen.

The application is based on these facts:

SEE ATTACHED AFFIDAVIT

☑ Continued on the attached sheet.

Reviewed by AUSA/SAUSA:

AUSA Katherine Wong

*Applicant's signature*

FBI Special Agent Jeremy Desor
*Printed name and title*

Sworn to before me and signed in my presence.

Date: ___03/13/2017___

/s/
Theresa Carroll Buchanan
United States Magistrate Judge
*Judge's signature*

City and state: Alexandria, Virginia

Theresa C. Buchanan, United States Magistrate Judge
*Printed name and title*

IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF VIRGINIA

Alexandria Division

MAR 0 3 2017

IN THE MATTER OF THE SEIZURE OF:

All funds held in Bank of America Account
Number 00008163899

All funds held in Capital One Bank Account
Number 1356741109

All funds held in Capital One Bank Account
Number 1360984229 in the name of Crescent
Ridge Capital Partners

All funds held in Interactive Brokers Account
Number U1616013

All funds held in Northbrook Bank and Trust
Company Account Number 7570148894 in the
name of Crescent Ridge Capital Partners

All funds held in Northbrook Bank and Trust
Company Account Number 7527270497 in the
name of Crescent Ridge Volatility Fund

2015 Tesla Model S70D with Vehicle
Identification Number 5YJSA1E28FF109547

Case No. 1:17-SW-122 through 124
and 126 through 129

## AFFIDAVIT IN SUPPORT OF A CRIMINAL COMPLAINT, APPLICATION FOR A SEARCH WARRANT, AND APPLICATIONS FOR SEIZURE WARRANTS

I, Jeremy Desor, being first duly sworn, state:

### INTRODUCTION AND AGENT BACKGROUND

1.      I make this Affidavit in support of the following: a criminal complaint and arrest

1

warrant for TAMER MOUMEN, who resides at 20281 Gleedsville Road, Leesburg, Virginia (the "Target Residence"); an application to search the Target Residence; applications for seizure warrants for the following financial accounts controlled by MOUMEN: Bank of America account 000081638899 (the "Target Bank of America Account"), Capital One accounts 1360984229 and 1356741109 (the "Target Capital One Accounts"), Interactive Brokers account U1616013 (the "Target Interactive Brokers Account"), and Northbrook Bank and Trust Company accounts 7527270497 and 7570148894 (the "Target Northbrook Accounts") (collectively, the "Target Financial Accounts"); and an application for a seizure warrant for a Tesla automobile (the "Target Tesla") owned by MOUMEN.

2.     I am a Special Agent with the Federal Bureau of Investigation (FBI), and I have been so employed for approximately 12 years. I am currently assigned to the FBI's Washington Field Office (WFO). As part of my assigned duties, I investigate possible violations of federal criminal law. I have also worked in the Chicago and San Francisco offices of the FBI. I have been assigned to squads that focus on the investigation of white collar crime in Chicago, San Francisco, and WFO. During my career as an FBI agent, I have participated in more than 30 such white collar investigations, and I have been the lead or co-lead agent in more than 20 of those investigations. I have also worked in the Economic Crimes Unit at FBI Headquarters with program management responsibilities relating to white collar programs.

3.     I am familiar with the information contained in this Affidavit. This Affidavit is based upon information from several sources, including my personal observations, information provided to me by other law enforcement agents and officers, communication between a FBI Undercover Employee (UCE) and MOUMEN, documents and financial records provided by different entities and individuals, and publicly available information. This Affidavit is offered for

2

the sole purpose of establishing probable cause in support of a criminal complaint against MOUMEN and applications for seizure and search warrants and does not set forth all of the facts of this investigation.

4.      Based on my training and experience and the facts as set forth in this Affidavit, I submit that there is probable cause to believe the following: MOUMEN has committed violations of 18 U.S.C. § 1343 (Wire Fraud), 18 U.S.C. § 1956 (Money Laundering), and 18 U.S.C. § 1957 (Engaging in monetary transactions in property derived from specified unlawful activity) (collectively, the "subject offenses"), in the Eastern District of Virginia and elsewhere; the Target Residence contains evidence of the subject offenses; and proceeds of the subject offenses are contained in the Target Financial Accounts and were used to purchase the Target Tesla.

## JURISDICTION

5.      I make this application under Rule 41 of the Rules of Criminal Procedure in support of a search for the Target Residence, surrounding curtilage outside the residence, and real property and premises known as described as 20281 Gleedsville Road, Leesburg, Virginia more particularly described in the following paragraphs and in Attachment A, for evidence, fruits of crime and property designed for use, intended for use, or used in committing a crime, as further described in the following paragraphs and Attachment B.

6.      My investigation has revealed that a corporation, CRCP, was registered in the Eastern District of Virginia as part of and in furtherance of the subject offenses. During the commission of the offenses under investigation, MOUMEN lived in the Eastern District of Virginia, from where he communicated, coordinated, and took steps in furtherance of the subject offenses.

## BACKGROUND

7.      MOUMEN operates his investment business through the entity CRCP, a company created in the Commonwealth of Virginia. MOUMEN is listed as "Managing Partner" on CRCP's website (www.crescentridgefunds.com).

8.      According to its website, CRCP has two investment funds, the "Crescent Ridge Volatility Fund" (CRVF) and the "Crescent Ridge Energy Fund" (CREF). As of February 14, 2017, the CRCP website included statistics for the funds' historical performance and compared the performance to the S&P 500. Both funds were held out as beating the returns on the S&P 500, which is used as a performance index. With respect to the CRVF, the website showed a "cumulative return" of 119.03% versus a return of 70.93% for the S&P 500. The website also showed a one-year return for the CRVF of 21.89% (versus 11.98% for the S&P 500) and a three-year return of 79.84% (versus 29.09% for the S&P 500). With respect to the CREF, the website showed a "cumulative return" of 57.20% versus a return of 12.48% for the S&P 500. The website also showed a one-year return for the CREF of 54.78% (versus 11.98% for the S&P 500).

9.      MOUMEN's biography on the CRCP website states, "Since 2004, his equities trading strategy has become paramount to the success of Crescent Ridge's flag ship fund, Crescent Ridge Volatility Fund, LP…" Although MOUMEN's biography touts the success of the CRVF going back to 2004, an online search of the Virginia State Corporation Commission database reflected CRVF's "Date of Formation/Registration" as December 6, 2011.

10.     MOUMEN's biography does not mention anything about his employment history prior to CRCP. I have reviewed an account application MOUMEN completed for opening an Individual Retirement Account (IRA) with Merrill Lynch. The application, dated October 14, 2014, listed MOUMEN's employer as "Lifetime Fitness" (LF) and him as being employed by LF for 13 years. I have reviewed records associated with some of MOUMEN's bank accounts going back to 2012, which show regular compensation from LF until in or around July 2014.

4

11.     MOUMEN's public LinkedIn profile lists him as the "Founder/Managing Partner" of Crescent Ridge Capital Partners, LLC from February 2011 to present.  It does not list any other work experience.  On the LinkedIn page, CRCP is described as a "Financial Services boutique firm."  MOUMEN's Twitter account, @HedgeTamer, describes him as "Hedge Fund Manager, philanthropist, fitness enthusiast, movie buff, loving father of four amazing kids."  It also provides a link to crescentridgefunds.com.

12.     The physical location listed on the CRCP website is 8000 Towers Crescent Drive, 13th Floor, Vienna, Virginia, which I know to be the location of Regus, a third-party company that offers virtual and physical office space to companies.

## SUMMARY

13.     As described more fully below, I submit there is probable cause to believe that from a date unknown, but by at least 2014 and continuing through the date of this Affidavit, in the Eastern District of Virginia and elsewhere, the defendant MOUMEN and others known and unknown to the investigation, having knowingly devised a scheme and artifice to defraud investors, including R.M., and to obtain money and property, by means of materially false and fraudulent pretenses, representations, and material omissions, caused to be transmitted by means of wire communications in interstate commerce certain writings, signs, signals and sounds, for the purpose of executing such scheme and artifice to defraud.

**Purpose of Scheme**

14.     One of the purposes of the scheme was to benefit and enrich MOUMEN.

**Manner and Means**

15.     The ways, manner, and means by which MOUMEN and others known and unknown

to the investigation sought to accomplish the scheme and its objectives included, but were not limited to, the following:

    a.  Recruit prospective investors by promoting the experience and expertise of MOUMEN and his associates, as well as the purported success of MOUMEN and various "funds" that he managed/controlled.

    b.  Make false, fraudulent and misleading representations and material omissions about CRCP, how investors' money would be used; the methods by which MOUMEN and others would attempt to generate profits and returns; the true financial condition of CRCP and its various funds; the expertise and qualifications of MOUMEN and others; what expenses/fees would be paid using investor money or profits; and the compensation structure for MOUMEN and others.

    c.  Using investor funds for different purposes than what was disclosed to investors, including to pay old investors, and to pay MOUMEN's personal expenses such as rent, mortgage payments and buying a Tesla.

    d.  Concealing and misrepresenting the true financial condition of CRCP and its funds from existing and prospective investors, both initially and as the condition changed.

    e.  Concealing and misrepresenting the true disposition of investor money and the unauthorized uses of investor funds, including the use of new investor funds to pay old investors.

**Wires in Furtherance**

16.    On or about March 2015, in the Eastern District of Virginia and elsewhere, the defendant MOUMEN and others known and unknown to the investigation, for the purpose of executing the scheme and artifice to defraud, and to aid and abet the same, transmitted and caused

to be transmitted by means of wire communications in interstate commerce writings, signs, signals and sounds: to wit, a wire of over $42,000 from RM's Kingdom Trust account to the Target Northbrook Account in the name of CRVF ending in 0497 (hereinafter, "Northbrook CRVF 0497") account, and then a wire of $42,000 from Northbrook CRVF 0497 to MOUMEN's TD Ameritrade account.

## **Money Laundering**

17.     On or about November 15, 2016, in the Eastern District of Virginia, the defendant MOUMEN and others known and unknown to the investigation did knowingly conduct and attempt to conduct a financial transaction affecting interstate and foreign commerce, to wit, wired $321,825 from the Target Bank of America Account to V.S., a real estate title company in the Eastern District of Virginia, which involved the proceeds of a specified unlawful activity, that is wire fraud, knowing that the transaction was designed in whole and in part to conceal and disguise the nature, location, source, ownership and control of the proceeds of said specified unlawful activity and that while conducting and attempting to conduct such financial transaction knew that the property involved in the financial transaction represented the proceeds of some form of unlawful activity, all in violation of Title 18 United States Code Sections 1956(a)(1)(B)(i) and 2.

## THE TARGET FINANCIAL ACCOUNTS

18.     The Target Financial Accounts have been utilized by MOUMEN in connection with his investment fraud scheme and have been funded largely by investor funds. MOUMEN executed frequent transfers of investor funds between the Target Financial Accounts before the funds reached their ultimate disposition.

*The Target Bank of America Account*

7

19.     The Target Bank of America Account (account umber 000081638899, hereinafter "Bank of America Moumen 8899") is in the name of MOUMEN and his wife Stephanie Moumen. Bank of America Moumen 8899 received frequent transfers of funds from other MOUMEN-controlled accounts containing investor funds.  From January 13, 2017 through February 16, 2017, the account received approximately $161,000 in such transfers.  In total, the account received deposits of approximately $172,300 during this time period, meaning the transfers of investor funds represented approximately 93.4% of all deposits.

20.     In November 2016, Bank of America Moumen 8899 received a transfer of $321,825 in investor funds.  MOUMEN then used these funds as part of a down payment for the Target Residence.

***The Target Capital One Accounts***

21.     The Target Capital One Accounts include the following:

a.      Account number 1360984229 in the name of CRCP (hereinafter "Capital One CRCP 4229").

b.      Account number 1356741109 in the name of TAMER MOUMEN (hereinafter "Capital One Moumen 1109").

22.     I have reviewed records for Capital One CRCP 4229 from when the account was opened in September 2015 through February 28, 2017.  From November 2016 through February 2017, the account received deposits from individuals believed to be investors totaling more than $800,000.

23.     I have reviewed records for Capital One Moumen 1109 from when the account was opened in December 2015 through March 7, 2017.  This account received frequent large transfers of funds from other MOUMEN-controlled accounts containing investor funds.  These transfers totaled approximately $2.6 million and included four transfers of more than $200,000 each in June

2016 and transfers totaling more than $380,000 in February 2017.

***The Target Interactive Brokers Account***

24.     The Target Interactive Brokers Account is an "Individual" account titled in the name of TAMER MOUMEN (account number U1616013, hereinafter "Interactive Brokers Moumen 6013"). This account is the primary account through which MOUMEN has traded investor funds since the account was opened in October 2015.

25.     This account has been funded almost entirely by transfers of investor funds. Typically, MOUMEN received investor funds through his corporate bank accounts, including Capital One CRCP 4229, a Capital One account in the name of CREF, and the Target Northbrook Accounts. Prior to transferring the funds to Interactive Brokers Moumen 6013, MOUMEN transferred the funds into bank accounts in his name, typically Bank of America Moumen 8899 or Capital One Moumen 1109. MOUMEN then transferred the funds from his personal bank accounts into Interactive Brokers Moumen 6013.

26.     MOUMEN transferred approximately $3.6 million of investor funds to Interactive Brokers Moumen 6013 during the time period of October 2015 through January 2017. As a result of trading losses, fees, and withdrawals, the balance for the account was only $145,025.24 as of January 31, 2017.

***The Target Northbrook Bank Accounts***

27.     The Target Northbrook Accounts include the following:

a.     Northbrook CRVF 0497.

b.     Account number 7570148894 in the name of CRCP (hereinafter, "Northbrook CRCP 8894").

28.     I have reviewed records for Northbrook CRVF 0497 from January 2014 through February 28, 2017. During this time period, the account received deposits totaling $6.6 million, of

which all but approximately $1,300 was comprised of investor funds. The account received deposits from investors totaling approximately $776,000 in February 2017.

29.     I have reviewed records for Northbrook CRCP 8894 from July 2014 through February 28, 2017, which showed this account was funded entirely by transfers from Northbrook CRVF 0497. Northbrook CRCP 8894 was the account from which the Target Tesla was purchased. In February 2017, Northbrook CRCP 8894 received transfers of investor funds from Northbrook CRVF 0497 totaling approximately $158,000.

## TRADING ACTIVITIES THROUGH CRCP

30.     As reflected on the CRCP website, MOUMEN holds himself out as a successful trader who can deliver large returns for investors. My investigation, however, has revealed that MOUMEN appears to have no relevant work experience prior to forming CRCP and starting to solicit investors. From my training and experience, I know that individuals seeking to solicit investor funds will sometimes misrepresent or overstate their experience and expertise with trading.

31.     I have obtained and analyzed account records for numerous bank and brokerage accounts associated with MOUMEN, CRCP, CRVF, and CREF. This analysis has identified approximately $7.5 million in funds provided to MOUMEN from individuals I believe to be CRCP investors, based on interviews of one investor, correspondence received from third parties, notations of "investment" on various payments, and similarities among the transactions.[1] According to promotional material, CRCP, CRVF and CREF purport to be investment vehicles. CRVF and CREF appear to be marketed as similar to hedge funds. Based on a review of the

---

[1] Because the investigation is currently covert and ongoing, many of the individuals believed to be investors have not been interviewed, due to concerns that these individuals may then contact MOUMEN or his associates, thereby alerting them to the investigation and thus enabling the target to conceal or dissipate fraud proceeds, destroy evidence, or otherwise take steps to evade prosecution.

promotional material, an interview with an actual investor, and statements that MOUMEN made to a FBI UCE, I believe that the $7.5 million was from investors, and does not constitute a return of capital, repayment of loans, or gifts to MOUMEN. To date, the investigation has identified approximately 30 individuals believed to be investors, some of whom provided money on several different occasions to MOUMEN and/or his entities.

32.     Despite publicly representing and promoting CRCP as having established investment funds, the records show that most of the trading conducted by MOUMEN was done through personal brokerage accounts titled in MOUMEN's name. Other funds received into accounts for CRCP, CRVF and CREF were ultimately used to pay personal expenses and make payments to individuals who had previously paid money into CRCP, CRVF and CREF – and thus appear to be other investors.

33.     The investor funds MOUMEN received included approximately $6.6 million from January 2014 through February 2017 via Northbrook CRVF 0497.

34.     After investors transferred money to him or accounts that he owned/controlled, MOUMEN typically transferred those funds into other, personal accounts titled in his name. For example, individual SE caused $200,000 to be deposited into Northbrook CRVF 0497 in November 2014. The details for the transaction referenced "Investment" as the purpose of the transaction. On the same day the deposit was received, MOUMEN transferred $38,000 to Bank of America Moumen 8899 bank account and an additional $150,000 to a personal brokerage account MOUMEN held at TD Ameritrade.

35.     Much of the investor funds transferred into MOUMEN's personal bank accounts were ultimately deposited into personal brokerage accounts in MOUMEN's name. From October 2015 through January 2017, MOUMEN deposited approximately $3.6 million in this manner into Interactive Brokers Moumen 6013. From January 2014 through June 2015, MOUMEN deposited

11

approximately $1.4 million in this manner into a personal brokerage account he held at TD Ameritrade.

36.    The investigation has revealed that investor funds were primarily traded using accounts in MOUMEN's own name, rather than in the name of a fund. With the exception of an Interactive Brokers Account held in the name of CRVF that received one deposit of $350,000 in January 2014, I have not identified any brokerage accounts in the name of CRCP, CRVF, or CREF. Rather, to the extent MOUMEN did use investor money for trading, the investigation has revealed that these trades were conducted through his personal brokerage accounts. Nothing on the CRCP website or in the promotional materials that I have reviewed discloses that MOUMEN was conducting trades in his name or through his personal accounts. Further, because of the manner in which he was conducting the trades, on its face the money and purpose of the trades appear to be personal, rather than on behalf of others.

37.    Brokerage account records show that MOUMEN's trading activity resulted in significant losses, which was not disclosed on the CRCP website, in materials provided to investors, or in soliciting the UCE, who was posing as a prospective investor. MOUMEN has exhibited a pattern consistent with "day trading," in which he places a high volume of trades in high-risk options. For example, MOUMEN's trading in Interactive Brokers Moumen 6013 resulted in more than $2 million in losses between October 2015 and January 2017. MOUMEN's high-volume trading also resulted in significant commission expenses, which totaled more than $500,000 for that same time period. As a result of the trading losses, commission expenses, other fees, and withdrawals made by MOUMEN, Interactive Brokers Moumen 6013 had a balance of approximately $145,000 as of January 31, 2017 despite deposits of approximately $3.6 million in investor funds.

38.    MOUMEN's trading in his personal TD Ameritrade account produced similar

results with losses of more than $1 million from January 2014 through September 2015, at which time the account was closed. MOUMEN's trading through the CRVF account at Interactive Brokers also resulted in large losses. After $350,000 of money from individuals believed to be investors was deposited into this account in January 2014, trading activity caused close to $250,000 in losses and $82,000 in commission expenses by November 2014, at which time the account was closed.

## USE OF INVESTOR FUNDS FOR PERSONAL EXPENSES

39.     In addition to losing investor funds through high-risk trading, MOUMEN spent large sums of investor money on personal expenses. For example:

a.      On January 27, 2015, individuals NE and AE wired a total of approximately $169,000 to Northbrook CRVF 0497, which had a prior balance of $0. That same day, MOUMEN transferred $18,000 to Bank of America Moumen 8899, which had a prior balance of $9,023, comprised of other investor funds that had been previously transferred to that account. The next day, MOUMEN purchased a cashier's check to pay rent on his personal residence.

b.      On February 3, 2016, individual JP wired nearly $240,000 into Northbrook CRVF 0497, which had a balance of $152 prior to this deposit. MOUMEN then transferred $92,000 from this account to Northbrook CRCP 8894, which had a prior balance of $144. The next day, MOUMEN wired $90,188 from the CRCP account to Tesla Motors to purchase the Target Tesla.

c.      On August 25, 2016, individual MT deposited close to $47,000 into Northbrook CRVF 0497, which was overdrawn by $83 prior to this deposit. On August 29, 2016, MOUMEN transferred $46,600 from this account to Bank of America Moumen 8899, which had a prior balance of $2,082. On September 1, 2016, MOUMEN made a payment of $21,147 from Bank of America Moumen 8899 to the Internal Revenue Service, which appears to have been for his personal tax liability because the payment details reference MOUMEN and his wife.

13

d.    MOUMEN utilized investor funds to purchase the Target Residence.  Further details on the relevant transactions are as follows:

i.    From November 10, 2016 through November 14, 2016, MOUMEN received a total of $440,000 from individuals I believe to be investors via Capital One CRCP 4429.  The account had a balance of approximately $15,296 prior to receiving these funds.

ii.    On November 14, 2016, MOUMEN transferred $321,825 from Capital One CRCP 4429 to Bank of America Moumen 8899, which had a prior balance of approximately $20,543.

iii.    On November 14, 2016, MOUMEN wired $15,000 from Bank of America Moumen 8899 to "[V.S.]" with a reference to the Target Residence address. On November 15, 2016, MOUMEN wired $321,825 from Bank of America Moumen 8899 to V.S.; this wire also referenced the Target Residence address.

iv.    From May 2016 through November 7, 2016, MOUMEN sent an additional $47,000, which included investor funds, to V.S.

v.    A public records search shows that a mortgage was recorded on the Target Residence in MOUMEN's name on November 16, 2016 with V.S. serving as the Title Company on the transaction.

## PAYMENTS TO INVESTORS

40.    MOUMEN also used new investor funds to pay earlier investors.  Based on my training and experience, I know that individuals who are misusing investor funds will often seek to conceal the existence of the fraud and scheme by making lulling payments to earlier investors, in order to create the appearance that the investments are earning the reported returns.  The

14

distributions in this case are consistent with a "Ponzi" scheme. The use of new investor funds to pay old investors was not disclosed on the CRCP website or in its promotional material. Examples of this including the following:

  a.  On May 13, 2015, individual SE deposited $131,000 into Northbrook CRVF 0497 with a reference to "Investment." An additional $25,000 was deposited by another investor that same day, resulting in an account balance of $156,166. That same day, MOUMEN paid $36,000 from this account to earlier investor EK.

  b.  On August 31, 2015, individual JP wired approximately $250,000 into Northbrook CRVF 0497, which had a prior balance of $68. That same day, MOUMEN paid $75,000 from this account to investor TE.

INVESTOR RM

  41.  Investor RM wired $42,271 to Northbrook CRVF 0497 on March 17, 2015. The next day, MOUMEN transferred $42,000 from this account to his personal TD Ameritrade trading account. A month later, due to trading losses and transfers, the account balance was $106 as of April 30, 2015. The transfers were to Bank of America Moumen 8899 and MOUMEN used the funds to pay for his personal expenses, resulting in a balance of $622 by April 30, 2015. The analysis thus shows that by April 30, 2015, MOUMEN had caused nearly all of RM's funds to be used for purposes not disclosed or approved by RM, or lost in trading through MOUMEN's personal account.

  42.  According to RM, RM and MOUMEN attended the same high school but were not close friends. RM recently reconnected with MOUMEN through RM's brother, who had learned MOUMEN was involved in the investment business.

  43.  RM met with MOUMEN to discuss investments on multiple occasions. MOUMEN told RM that he had successfully invested his money and his business partner's money and was

15

now managing investments for friends and family. MOUMEN said he was an experienced and successful trader.

44.     MOUMEN talked about doubling RM's money in five years. RM was concerned about the fees RM had been paying on her existing retirement account and MOUMEN said RM would save money on fees by investing with him.

45.     RM stated that the $42,000 was an investment with CRCP. MOUMEN helped RM establish an IRA with Kingdom Trust, through which RM made the investment with CRCP. My investigation has revealed that Kingdom Trust is a third-party company that provides self-directed IRAs. According to the website, Kingdom Trust acts only as a custodian for the assets held inside a self-directed IRA. Bank records show that many deposits into CRCP and the different funds promoted by MOUMEN came from accounts with Kingdom Trust.

46.     RM had online account access through the CRCP website, which gave RM access to monthly account statements. RM's monthly statements showed steady gains to RM's investment.

47.     RM provided me with copies of statements she received from CRCP. The statements reported that RM's investment was growing: for example, the statement dated November 30, 2016, reported $59,667.17 as the "Available Balance for Redemption." The statement also showed a "Linked IRR [Internal Rate of Return] for Fund" of 19.60% for "Year to Date," compared to a return of 7.58% for the S&P 500 over the same time period. Based on my training, experience and analysis of the relevant accounts, I believe the account statements CRCP provided to RM were false and fraudulent. Bank records show that RM's investment had been spent or dissipated by May 2015, however, account statements did not disclose these trading losses or the use of these funds for MOUMEN's personal expenses. I know that individuals engaged in investment fraud will often seek to conceal the true status of the investment, such as trading losses, so that they can continue the fraud and avoid alerting investors to the true disposition of the funds.

16

48.     In addition to misrepresenting the performance of RM's investment on RM's account statements, MOUMEN provided periodic fund updates via newsletters that also contained misrepresentations, including a document dated September 29, 2015 and titled "September Newsletter." RM received a copy of the newsletter via email. The newsletter stated, "Since their inception, hedge funds were designed to flourish in the current environment by smoothing out volatility and delivering superior risk-adjusted returns. To be candid, that is exactly what we've been doing…In August, the average hedge fund declined 2.2 percent vs. the Standard & Poor's 500 stock index, which ended down 6.3 percent. I am happy to report that our Fund actually reported a positive 2.61% return…"

49.     RM also received by email a document dated July 3, 2016 titled "2nd Quarter Newsletter." The newsletter stated, "…Our ability to raise cash and take advantage of volatility in both directions bodes well for continued outperformance. The Crescent Ridge Volatility Fund LP is now up 11.82% year to date (verses [sic] our benchmark S&P 500 at 3.84%) and on track for our third consecutive 20+% yearly performance…"

### COMMUNICATIONS WITH FBI UNDERCOVER EMPLOYEE (UCE)

50.     In January 2017, a FBI UCE was introduced to MOUMEN as an individual who was interested in investing with MOUMEN.

51.     In February 2017, the UCE and MOUMEN exchanged text messages while trying to plan an in-person meeting. On February 8, 2017, the UCE asked MOUMEN by text message, "…do you have any brochures or literature about the funds…that you can send me today before we meet?" MOUMEN responded by text, "Sure. Will do!"

52.     That evening, MOUMEN emailed the UCE. In the email, MOUMEN wrote, "…I've attached tear sheets on both of our Funds that detail our strategy, philosophy, and performance since inception…" The attachments to MOUMEN's email included false information

regarding historical returns for the CRVF and CREF.  Specifically, the attachments included the following:

a.      A one-page summary relating to the CRVF.  The summary showed returns for 2013 through 2016 of 17.78%, 23.63%, 22.03%, and 20.83%, respectively.  The summary further showed that the CRVF had outperformed the S&P 500 with respect to "Cumulative Return" (119.03% versus 70.93%), "1 Year Return" (21.89% versus 11.98%), and "3 Year Return" (79.84% versus 29.09%).

b.      A one-page summary relating to the CREF.  The summary showed returns for 2015 and 2016 of 3.05% and 49.88%, respectively.  The summary further showed that the CREF had outperformed the S&P 500 with respect to "Cumulative Return" (57.20% versus 12.48%) and "1 Year Return" (54.78% versus 11.98%).

53.      On February 9, 2017, the UCE and MOUMEN had an in-person meeting, which was recorded.  I have reviewed the recording and observed MOUMEN make numerous misrepresentations to the UCE, including the following:

a.      MOUMEN predicted the market would end up flat for the year in 2017 but that he would return "20 plus percent" to investors.  The UCE asked MOUMEN, "So...you feel as though you can do 20% this year?"  MOUMEN responded, "Well, we have three years in a row..."

b.      MOUMEN stated that CRCP's fee structure included a 1% administrative fee on all funds under management and a 17.5% performance fee on trading profits earned.  MOUMEN further stated, "...I only get paid if we make you money...if we have a down year...the next year I can't take any fees...until...I make you whole...I only get paid if I make you money..."

c.      The UCE asked MOUMEN, "What do you have under management now?" MOUMEN responded, "We're hanging out right around 30 [million] in the Volatility Fund...with the Energy Fund, which we started just a year-and-a-half ago, there's a little over 8 million..."

d.     The UCE asked MOUMEN, "Your strategy, are you on the aggressive side?" MOUMEN responded, "Not at all…"

e.     With respect to the Energy Fund, MOUMEN said, "I started it with 250K and now it's 8.2 million and that was a year-and-a-half ago…we did 49% in that fund last year…"

f.     When asked by the UCE about how confident he was in being able to return 20% this year, MOUMEN stated, "…Nothing…in this business is certain, I could lose all your money, but for four years straight I've only made money for my investors…I'm doubling your money in two to two-and-a-half [years]…so I'm pretty certain…"

g.     MOUMEN stated, "Another mandate that we have…we never take more than a 5% loss on a position…"

## THE TARGET TESLA

54.     The Target Tesla is a 2015 Tesla Model S 70D bearing Vehicle Identification Number 5YJSA1E28FF109547 and Virginia license plate VMB 5016. The Target Tesla is registered to TAMER MOUMEN and Stephanie Moumen at the Target Residence.

55.     MOUMEN paid for the Target Tesla via a $90,188 wire transfer from Northbrook CRCP 8894 to Tesla Motors on February 4, 2016. This wire was funded by a transfer of $92,000 from Northbrook CRVF 0497 on February 3, 2016. The funds that were transferred came directly from a $239,938 deposit from investor JP.

## THE TARGET RESIDENCE

56.     As detailed above, MOUMEN utilized investor funds to purchase the Target Residence in his name in November 2016. Public records show that the Target Residence sold in November 2016 for $1.03 million dollars. From my review of records related to the transaction, I believe that MOUMEN obtained a loan from Movement Mortgage in order to finance the purchase of the Target Residence. Based on my training and experience, I know that mortgage companies

19

often require documentation regarding a loan applicant's income and employment history. In the case of individuals who hold themselves out to be self-employed, like MOUMEN, they may require additional information about that individual's business and the business's financial condition. At the time that MOUMEN purchased the home, he was running CRCP. At closing, a homeowner must typically sign various documents related to the purchase of the residence, including a copy of any loan application; a copy of these documents is then given to the homeowner. I believe that such documents may contain relevant information about who owned and controlled CRCP, as well as the valuation of CRCP and MOUMEN's actual income from CRCP.

57.     The Target Residence is associated with certain of the Target Financial Accounts that received investor funds as part of MOUMEN's scheme. For example, the mailing address for the Bank of America Moumen 8899 account has been the Target Residence since September 21, 2016 through the present. The statements for another Bank of America account in MOUMEN's name also include the address for the Target Residence.

58.     Similarly, the mailing address for the Capital One Moumen 1109 account was changed to the Target Residence beginning in November 7, 2016 through the present. The "Account Information Sheet" for this account also listed the Target Residence as MOUMEN's address. The statements for another Capital One account in MOUMEN's name also included the address for the Target Residence starting with the statement ending November 7, 2016.

59.     From my training and experience, I know that financial institutions, such as Bank of America and Capital One, generally send correspondence regarding that account to the mailing address, which here is the Target Residence. Statements and other correspondence for these accounts are relevant because investor funds were transferred into these accounts, so the statements are relevant to showing the use and disposition of the fraud proceeds and laundered funds.

60. The Target Tesla is registered to MOUMEN at the Target Residence. I observed the Target Tesla parked at the Target Residence on February 24, 2017. As detailed above, the Target Tesla was purchased using investor funds. Based on my training and experience, I know that individuals often keep and maintain copies of paperwork related to large purchases, such as homes and vehicles, where they live, which would be the Target Residence for MOUMEN.

61. From my training and experience, I have learned that individuals engaged in fraudulent schemes frequently maintain evidence relating to their fraudulent schemes at their residences rather than in public places or offices open to the public, particularly if they are seeking to conceal and/or continue the scheme. These items include financial records and other business records, as well as digital evidence stored on desktop computers, laptop computers, and cell phones. In this case, I know that MOUMEN has used computers to communicate with investors and a cellular phone to communicate with the UCE, who was posing as a prospective investor. I also know that individuals who are self-employed, such as MOUMEN, often take home their computer and cellular phones that are used for work purposes.

62. The UCE and MOUMEN communicated by text message using cell phones. While meeting with the UCE, MOUMEN accessed information on his cell phone and showed the UCE details relating to fees CRCP had paid to Kingdom Trust on behalf of clients. MOUMEN also communicated with investor RM by phone and text message using two different cell phones.

63. With respect to the trading activity for CRCP clients, MOUMEN told the UCE, "I do it all." In order to execute the trades, MOUMEN utilized brokerage accounts in his own name that included online access to trading platforms. I believe MOUMEN utilized the online access to place trades given the nature of how trading activity is conducted in the financial industry and the high volume of trades MOUMEN conducted.

64. Investor RM and others received periodic newsletters written by MOUMEN. These

21

newsletters were electronically created by MOUMEN and circulated by email.

65.     MOUMEN talked in detail with the UCE about the market research and monitoring MOUMEN conducts. MOUMEN talked about conducting research and trades outside of the hours when the U.S. stock markets are open. MOUMEN told the UCE that he switched brokers at one point because the prior broker "wouldn't let me trade at…4am, the platform just wasn't set up for that." MOUMEN further stated, "…at 4am, 5am, the U.S. is just getting started, Europe is in the middle of its day…Asia is ending its day. So you have a global market and there's a lot of activity in S&P futures and oil commodity futures, so it helps with, with both funds." MOUMEN also told the UCE that his favorite time to trade was "Sunday night when the oil pits, gold etcetera futures open at 6pm. So, so much is done before…Monday morning." Based on his comments to the UCE, I believe MOUMEN conducts his early morning and Sunday evening trades and research from the Target Residence.

66.     I have reviewed Internet Protocol (IP) address records associated with logins to the Interactive Brokers trading platform for Interactive Brokers Moumen 6013. I obtained "geolocation data" for certain IP addresses associated with Interactive Brokers Moumen 6013 login records through www.iplocation.net. The results showed that from January 2017 through March 5, 2017, the Interactive Brokers trading platform was accessed regularly from IP addresses associated with Leesburg, Virginia, the location of the Target Residence. I also know that the purported offices for CRCP are not located in Leesburg, Virginia. Based on the login information for this account, I believe that MOUMEN is operating the scheme and crimes under investigation from the Target Residence, among other locations.

67.     Based on my training and experience, I also know that businesses typically maintain records for 6 to 7 years. MOUMEN holds CRCP out as a legitimate business. There is also evidence in this case that MOUMEN has produced or caused the production of various records

22

designed to make CRCP appear legitimate, such as "tear sheets," monthly newsletters and investor statements. The website for CRCP also gives investors online access to their statements. I know that participants in a fraud scheme often keep copies of such documents, and may in fact print out or maintain physical records – particularly if they are editing or preparing drafts. According to CRCP's website, MOUMEN also has several individuals who are working with or for him. Based on my training and experience, I know that individuals who are organizing or leading a fraud scheme often retain copies of important documents, communications, or other records. In this case, MOUMEN purports to track the "returns" earned by different investors, and investors are provided with statements showing how their investments are doing. Investors are also provided with newsletters that report returns for different purported funds and compare them to the S&P500. Electronic copies of such documents can provide information about who created, edited or otherwise modified the records, and thus provide insight into the manner and means of the scheme and conspiracy.

68.     Based on my training and experience, I also know that most providers of cellular services do not store copies of text messages on their servers. As such, to obtain the content of any text messages, it is necessary to look at the sender/recipient's phone. Text messages are typically maintained on a phone unless and until they are deleted. As recently as February 2017, MOUMEN used text messages to communicate with the UCE. I also know that MOUMEN has a Twitter account and frequently posts or re-tweets other postings. Some of these postings relate to the financial markets. I know that individuals can tweet by using a computer or through an "app" on their phone. Such tweets can provide information about an individual's location at a particular time. In March 2017, some of MOUMEN's tweets were in the early morning (between 3-4 am) and others are late at night (after 10 pm), indicating that they were likely made while MOUMEN was at the Target Residence. From his meeting with the UCE, I believe such tweets are part of

MOUMEN's efforts to hold himself out as an experienced, knowledgeable and successful investment advisor.

## CONCLUSION

69.     Based on the foregoing, there is probable cause to believe that, beginning no later than February 2013 and continuing through the present, in the Eastern District of Virginia and elsewhere, TAMER MOUMEN has knowingly devised and intended to devise a scheme and artifice to defraud investors to obtain money and property by means of materially false and fraudulent pretenses, representations, and promises, and for the purpose of executing the scheme and artifice to defraud transmitted and caused to be transmitted by means of wire communications in interstate commerce, certain writings, signs, signals and sounds, in violation of Title 18, United States Code §1343 (Wire Fraud).

70.     Further, there is probable cause to believe that, in the Eastern District of Virginia and elsewhere, TAMER MOUMEN conducted financial transactions knowing the property involved in such transactions represented the proceeds of Wire Fraud, and did so with the intent to promote the carrying on of his Wire Fraud scheme, in violation of 18 U.S.C. § 1956(A)(i) (Money Laundering). In addition, there is probable cause to believe MOUMEN knowingly engaged in monetary transactions in criminally derived property of a value greater than $10,000 involving property derived from Wire Fraud, in violation of 18 U.S.C. § 1957 (Engaging in monetary transactions in property derived from specified unlawful activity), in the Eastern District of Virginia and elsewhere. I therefore respectfully request an arrest warrant authorizing the arrest of MOUMEN.

71.     I believe the Target Residence contains evidence, fruits and instrumentalities of the subject offenses. I therefore respectfully request that the Court issue the proposed search warrant for the Target Residence, as described in Attachment A, for the items listed in Attachment

24

B.

72.     Further, I have probable cause to believe the Target Tesla was purchased using funds obtained by MOUMEN as a result of his fraudulent scheme. Based on the information in this Affidavit, there is probable cause to believe the Target Tesla (further described as 2015 Tesla Model S 70D bearing Vehicle Identification Number 5YJSA1E28FF109547) is subject to seizure and forfeiture pursuant to 18 U.S.C. § 981(a)(1)(A) as property involved in transactions in violation of Title 18, U.S.C. §§ 1956 and 1957,  (Money Laundering); and pursuant to 18 U.S.C. § 981(a)(1)(C) as the proceeds used to purchase the Target Tesla are directly traceable to violations of 18 U.S.C. § 1343 (Wire Fraud), a specified unlawful activity as listed in Title 18, U.S.C., § 1956(c)(7)(A) incorporated by reference in Title 18, U.S.C § 1961(1) (B)

73.     Further, I have probable cause to believe the Target Financial Accounts listed below contain funds obtained by MOUMEN as a result of his fraudulent scheme and are subject to seizure and forfeiture pursuant to 18 U.S.C. § 981(a)(1)(A) as property involved in transactions in violation of Title 18, U.S.C. §§ 1956 and 1957,  (Money Laundering); and pursuant to 18 U.S.C. § 981(a)(1)(C) as the funds held in the accounts are directly traceable to violations of 18 U.S.C. § 1343 (Wire Fraud), a specified unlawful activity as listed in Title 18, U.S.C., § 1956(c)(7)(A) incorporated by reference in Title 18, U.S.C § 1961(1) (B).

74.     My analysis of the various bank accounts shows that in the prior 12 months, MOUMEN has deposited proceeds of the Wire Fraud described above in the amounts listed below. Accordingly, I seek to seize the listed accounts up to the amount of the fraud proceeds deposited into these account pursuant to 18 U.S.C. § 984 which provides that it shall not be a defense to forfeiture that the property involved in the offense has been removed and replaced by identical property.  The amount of fraud proceeds deposited into the individual accounts in the preceding 12 months is as follows:

a.  Bank of America account 000081638899 in the names of TAMER MOUMEN and Stephanie Moumen – $1,331,000.

b.  Capital One account 1360984229 in the name of Crescent Ridge Capital Partners – $1,500,000.

c.  Capital One account 1356741109 in the name of TAMER MOUMEN – $2,800,000.

d.  Interactive Brokers account U1616013 in the name of TAMER MOUMEN – $2,321,000.

e.  Northbrook Bank and Trust account 7527270497 in the name of Crescent Ridge Volatility Fund – $2,841,000.

f.  Northbrook Bank and Trust account 7570148894 in the name of Crescent Ridge Capital Partners – $316,000.

75.  I therefore respectfully request that the Court issue the proposed seizure warrants for the Target Financial Accounts, as further described in Attachments C through F, and the Target Tesla, as further described in Attachment G.

Respectfully submitted,

Jeremy Desor, Special Agent
Federal Bureau of Investigation

Subscribed and sworn to before me on the __13__ of March, 2017.

Theresa Carroll Buchanan
United States Magistrate Judge

The Honorable Theresa C. Buchanan
UNITED STATES MAGISTRATE JUDGE

IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF VIRGINIA

Alexandria Division

IN THE MATTER OF THE SEIZURE OF:

All funds held in Capital One Bank Account
Number 1356741109

Case No. 1:17-SW-123

**ATTACHMENT**
**Property to Be Seized**

The account to be seized is described as follows:

1.  Capital One account 1356741109 in the name of Tamer Moumen.

1